No. 34,608

In the Matter of the Estate of Rodney J. Park. VELNA FAY HESS, DELLA V. PARK and VELNA FAY HESS, Administratrix of the Estate of Adella Park, Deceased, *Appellees*, v. N. C. EMERY and AMERICAN SURETY COMPANY OF NEW YORK, *Appellants*.

(99 P. 2d 849)

Opinion filed March 9, 1940.

*F. D. Boyce,* of Minneapolis, *C. W. Burch, B. I. Litowich, LaRue Royce, L. E. Clevenger, E. S. Hampton* and *R. E. Haggart,* all of Salina, for the appellants.

*John J. McCurdy,* of Lincoln, *Lee Jackson,* of Minneapolis, *James·E. Smith* and *E. H. Hatcher,* both of Topeka, for the appellees.

The opinion of the court was delivered by

THIELE, J.: The question in this appeal is the liability of an administrator for failure to sell bank stock belonging to the decedent's estate.

One Rodney J. Park, who was a farmer of Ottawa county, died intestate June 5, 1928, leaving a widow, Adella, and two daughters, Velna Fay Hess and Della V. Park, as his heirs. At the time of his death and for some years prior, Park had owned eighteen shares in the Farmers State Bank of Tescott and had been a director of the bank. After Park's death, his widow and daughters went to the bank and talked over matters with N. C. Emery, cashier of the bank, and who had known Mrs. Park for many years. Their relations had been friendly and she had confidence in him and his ability as a business man. It was suggested by Emery he was as familiar with the business affairs of Rodney Park as anyone, and that he could act as administrator of the estate of the deceased. As a result of that conversation proper proceedings were had and Emery was appointed as administrator and gave bond in the sum of $7,000 with the American Surety Company of New York as surety. On June 25, 1928, Emery filed his inventory and appraisement showing livestock and other personal property appraised at $1,010, and a checking account of $383.78, the eighteen shares of bank stock appraised at $4,050, farm lands valued at $10,470, and a residence in Salina valued at $2,385. A single share in an elevator corporation was subsequently discovered. It will not be noticed further. At the time of his death Park was indebted to the bank in the sum of $2,325, evidenced by his note, and on April 25, 1929, the bank filed its claim against the estate for that amount and interest. The personal property, other than the bank stock, was sold at public sale for a net amount of $1,286.88 and report duly made to the probate court. Sometime within three months after his appointment Emery and his attorney talked with the probate judge, who told Emery to

sell the bank shares at private sale. No representation was ever made to the probate judge, nor was any order ever made by the probate court, that it was not necessary to sell the personal property to pay debts, nor was any order ever made not to sell the bank stock.

The bank stock was never offered at public sale, but in July, 1928, the administrator did offer privately to sell the stock to a few individuals most of whom were connected with the bank. The price asked was $225 a share. Emery also offered the stock to some other selected purchasers who did not purchase. All of the offers were to sell the entire eighteen shares and the price asked was approximately $225 per share.

In March, 1931, and more than two and one-half years after Emery's appointment as administrator, he filed a petition asking for authority to sell the Salina residence, alleging the personal property would be insufficient to pay the debts. Thereafter the property was sold for $2,500 cash, and of this amount $1,325 was applied on the principal of the bank's note, the balance being deposited in the administrator's account and used to pay interest on the indebtedness to the bank, taxes, and for other disbursements. After the sale had been made, but before a deed had been executed, the widow protested to the probate judge, who told her the property was sold and he could do nothing about it. She then saw Emery, asked him why he had sold that property as she had frequently told him she didn't want to sell it, and he informed her he had to sell that property in order to pay the indebtedness to the bank and other debts and that was all he could do about it. Mrs. Park told Emery she was dissatisfied and she then consulted an attorney, and in February, 1932, an action was commenced against Emery for damages growing out of the sale of the Salina property. Shortly after, Mrs. Park died and the suit was dismissed. About the same time Mrs. Park brought that suit, her daughter, Velna Fay Hess, filed a petition in the probate court alleging that Emery had failed to sell the bank stock within the time fixed by statute, to the injury of the estate; that he was not administering the estate for the real parties in interest, but for his own personal profit, and asking for his removal as administrator. Shortly after the petition to remove him was filed, Emery procured a reappraisement of the bank stock at $100 per share and attempted to sell it to some of those he had previously approached, pricing the stock at $175 and $150 per share. He did not dispose of

the stock until March 1, 1935, when he filed a petition for approval of a compromise settlement of the balance of the debt due to the bank in the sum of $1,000. This petition set up that the bank had a lien on the stock; that the bank was in process of liquidation; that there was no market for the stock, and he prayed for authority to assign the stock to the bank in full settlement. The court authorized the settlement. The acceptance on the part of the bank was signed by its vice-president and by Emery as its cashier. On the same day this settlement was made, Emery, as administrator, filed his final account and final settlement of the estate.

The daughters, Velna Fay Hess and Della V. Park, and Velna Fay Hess, as administratrix of the mother's estate, filed objections to the approval of the final account. These objections were overruled by the probate court, which closed the estate and discharged the administrator. The objectors perfected an appeal to the district court, where amended objections were filed. A demurrer lodged thereto by the administrator and his bondsmen was overruled, and on appeal that ruling was affirmed by this court (*In re Estate of Park*, 147 Kan. 142, 75 P. 2d 842).

Following disposition of that appeal the matter came on for hearing on the objections which are set out in the above opinion and need not be repeated here, and upon separate answers of Emery and the American Surety Company, but which contained identical allegations, which are summarized, viz.: The death of Park, heirship of his widow and children, Emery's appointment as administrator and qualification are admitted, all other objections being denied. It was affirmatively alleged the probate court and the district court on appeal were without jurisdiction to require the surety to account; that Park was the owner of eighteen shares of the stock of the named bank, that at the time of his death he was indebted to the bank on a promissory note, that the bank had a lien on the stock for the amount due and no valid transfer of the stock could be made; that when Park died general economic conditions were depressed, the market value of the bank stock could not be truly ascertained and the appraisers listed it at its book value; that the bank was finally merged with another bank and its stock was of little value at the time of the merger and thereafter; that the administrator at the time of qualifying offered said stock for sale, but could not find a purchaser; that the widow objected to the sale of the stock and requested it not be sold, the probate court found it should not be sold

and it was not sold until it was assigned to the bank under the compromise settlement on March 1, 1935; that the orders for compromise were not appealed from and are *res judicata;* that the heirs had full knowledge at all times of the condition of the estate, etc., and that the administrator acted in good faith; that the estate was indebted for more than the value of the personal estate and by reason of request of the heirs the Salina real estate was sold instead of the bank stock; that the heirs had full notice and never perfected any proceedings for the sale of the bank stock and are guilty of laches and not entitled to recover against the administrator or his surety. It was also alleged the petition to remove the administrator had been denied and the heirs had never appealed and by reason thereof the claims now asserted were fully determined and became *res·judicata.*

At the trial in the district court, findings of fact were made by the court from which the statement above made is taken, and the court also made findings as to the value of the stock and the good faith of the administrator, to which reference will later be made, and it concluded the final account of the administrator should not be approved nor final settlement ordered, and that the administrator and his surety should not be discharged until the administrator or his surety should make good the loss in the sum of $3,573.50 suffered by the estate by reason of the administrator's willful carelessness, neglect of duty and maladministration of the estate. Judgment was rendered accordingly.

Defendants filed a motion to set aside the findings of fact and conclusions of law and a motion for a new trial. The court made two corrections and then denied both motions. Defendants appealed.

Appellants first complain the trial court erred in ruling the burden of proof to establish his final account was on the administrator.

In support appellants direct our attention to *Calnan v. Savidge,* 68 Kan. 620, 624, 75 Pac. 1010. In considering that case it must be borne in mind that at the time it was decided three years were required for final settlement, and that there was a material and substantial difference between an annual and a final settlement was demonstrated in *Musick v. Beebe, Adm'r.,* 17 Kan. 47, 52, to which attention is directed. In the Calnan case an annual settlement was in controversy, and it was said an annual settlement was judicial in nature, and its allowance in its nature a judicial determination, not final, but prima facie evidence of correctness, and if objections are

afterwards made, the burden of showing incorrectness is upon the objector. In the case at bar the settlement was a final account and the objections were made prior to any determination. As a condition to his discharge, the administrator had to establish the correctness of his account. The fact some of the heirs filed objections did not relieve him. Nor did the fact the matter was being tried on appeal alter the situation. There was no provision of the probate code in effect at the time the final account was filed in the probate court that made any ruling of that court as to its correctness prima facie evidence on an appeal to the district court. The trial in the district court is a trial *de novo*. (G. S. 1935, 22-1107; *Darnell v. Haines*, 110 Kan.. 363, 203 Pac. 712; *In re Estate of Woodworth*, 145 Kan. 870, 881, 67 P. 2d 553.) The trial court ruled correctly on the burden of proof to establish the account. The question of burden of proof is also further discussed later herein, as pertaining to particular items.

Appellants complain as to the findings of fact with respect to the value of the bank stock, that improper evidence was received, that proffered evidence was excluded, and that findings concerning the diligence and care exercised by the administrator are not supported by the evidence. The court's findings go into detail. They may be summarized thus: The appraisement was made June 23, 1928, by the appraisers, one of whom was president of the bank, another was a director of the bank and the third was a businessman in Tescott, and that they consulted together and with Emery, the administrator, who was also cashier of the bank, and it was agreed the book value of the stock was $238 per share and that the value for the purpose of appraisement was $225 per share, or $4,050 for the eighteen shares. The court further found that during the year 1929 an eight percent dividend was paid by the bank to its stockholders and on January 9, 1929, the administrator was paid $144 dividends and accounted for the same in the probate court; and that the true value of the stock on the date of appraisal was $225 per share and that if the eighteen shares had been sold at public sale within three months after the date the administrator gave bond, as required by law, the same would have sold for $225 per share; also that the failure of the administrator to sell the stock within three months after giving his bond caused a loss to the estate of $3,573.50, of which $3,050 was caused by decrease in its value, and $667.50 paid by the administrator to the bank as interest on Park's note to the

bank during the long period of administration, less, however, the sum of $144 received as dividends. The court further found that the administrator did not make his final settlement in one year, never made any showing to the probate court for an extension of time to make final settlement and no such extension was ever granted by that court. The court further found the administrator was guilty of negligence and carelessness in looking after and handling the estate, and allowed his duties and fidelity to the bank of which he was cashier to unfairly influence his actions in handling the estate, and that he failed to exercise the diligence and care required of administrators and thereby caused the estate to suffer the loss of $3,573.50.

The first question is whether the evidence sustained the finding as to the value of the stock. Under the provisions of the statute then in force (R. S. 22-313), the administrator qualified by giving a bond, conditioned in part that he would file a true inventory of the assets of the estate, and that he would render a true account of his administration. By reason of other provisions, the administrator was required to return into court a true inventory (R. S. 22-501), the personal assets of which must be appraised in the manner required (R. S. 22-504 to 22-508, incl.), the inventory signed by the appraisers and administrator (R. S. 22-515), verified by the administrator (R. S. 22-517) and returned into court. Under R. S. 22-601 et seq., the administrator was directed to sell at public sale the whole of the personal estate liable for the payment of debts, although under R. S. 22-603 he could be authorized to sell at private sale. In connection with provisions for making settlement, it was provided by R. S. 22-909 the administrator should be chargeable with the amount of the sale bill and with all goods, chattels, etc., which should come to his hands to be administered. From the above-mentioned sections and others kindred thereto but not specifically pointed out, it would appear that the inventory returned by the administrator was prima facie evidence as to the property belonging to the estate and the value of the respective items. And that is the general rule (23 C. J. [Ex. & Admr., § 383], p. 1166). It follows from the inventory and appraisement returned by him, the administrator stood charged with the particular eighteen shares of bank stock, the prima facie value of which was $225 per share, or a total of $4,050, and that the burden of proof was on the administrator to prove his contention that it was worth a less sum. To sus-

tain that burden appellants offered the testimony of three witnesses. Emery, testifying in his own behalf, was asked many questions to show reasons why he did not sell the bank stock belonging to the estate, in the course of which it was shown he personally owned thirty-three shares. As abstracted, the record does not show any particular qualifications, but he testified that in 1928 the stock was worth not to exceed $150 per share. Keesling, an assistant bank examiner, produced and identified a report of the examination of the bank as of August 15, 1928. From the information therein contained he was permitted to state the book value of the stock was $240 per share, and deducting certain criticized and questionable assets from the book value would leave an actual value of about $200 per share. He also testified at length about various matters he would consider if he were a prospective buyer, from which he concluded the stock was worth about $130 to $135 per share. G. C. Hitchcock testified that Emery offered to sell him the stock. At one place he stated Emery's first offer was at $200 per share. Later he stated he had $4,000 to invest and it was going to take it all, then stated the price might have been at $225. Negotiations for sale continued but he found an investment he thought was better and bought a farm.

In addition, Heckert, who was a director and vice-president of the bank, and who was an appraiser of the estate, testified on direct examination the stock was appraised at its book value and its salability was not considered, and on cross-examination that the appraisers discussed the matter with Emery and put the value at $4,050, which figure they thought was fair.

Appellee's evidence included testimony of C. C. Hess, who stated that a share of the stock was offered to him by a third person at $175 in April of 1929 and that he went to Emery, told him of the offer and inquired as to the value, at which time Emery told him the book value was $238, the cash value was $225 and that he would make $50 if he bought. He followed the advice and bought the share. Appellants are critical and complain the appellee produced no witness to testify he would have paid $225 in 1928. It must be borne in mind it was not their duty to find a purchaser at any price in 1928 or thereafter, and the fact that over ten years thereafter such a witness was not produced is not important. The duty to find a purchaser for the shares of stock was on the administrator. Although it is more to be considered in connection with the adminis-

trator's diligence, there was evidence that Emery offered to sell the stock only in a single block, and that the persons whom he approached were those who would have been satisfactory to the bank's directorate.

Appellants direct our attention to authorities on the question of elements of proof of value of stocks under conditions similar to those existing here. We do not find it necessary to discuss them. As heretofore indicated, the return to the probate court of an inventory which listed the stock at its appraised value created a prima facie showing as to its worth. There was some testimony tending to support that showing. It seems undisputed that after Park's death in June, 1928, a dividend of eight percent on the stock was paid to the administrator in January, 1929. This could also be considered in determining value. The weight to be given Emery's statement and the somewhat inconclusive testimony of Keesling was for the trial court. We cannot say the trial court's finding as to value of the stock is either contrary to or not supported by the evidence.

Appellants also complain of the trial court's findings that the administrator was guilty of negligence and carelessness in handling the estate, and in allowing his interests in the bank of which he was cashier to unfairly influence him, as the result of which the estate suffered. The standard of duty to be performed by the administrator was set by the statutes. At the time of the death of Park, the widow consulted him, and as a result of his own representation that he knew more about her husband's business affairs than any other person, she consented to his appointment as administrator. With that knowledge and with the knowledge almost immediately disclosed to him when the inventory was prepared, and when it was quite evident that all of the personal estate except the bank stock was not sufficient to pay the bank's claim, let alone any other debts that might be proved and allowed as claims, he procured an order to sell the bank stock at private sale. His actions thereafter would indicate he thought that gave him unlimited time and discretion in selling the bank stock. He takes two positions as to its sale—one that the widow did not want him to sell it; the other that he immediately commenced to find a purchaser, but was never able to do so. Insofar as the first position is concerned, it is true the widow wrote him a letter in August of 1928 that she was against selling the bank stock because it was the easiest property to look after and her

husband always figured it good property. It appears this letter was the result of Emery's advice to her. In any event it could not control him in the performance of his duties, and as a matter of fact his testimony indicates he paid no attention to it, for he stated that immediately after qualifying he commenced looking for a purchaser. The testimony indicates he inquired of the directors of the bank whether they wished to purchase, and that he talked with them as to who would be a satisfactory purchaser to succeed Mr. Park on the board of directors. There is no evidence that he offered to sell the stock except as a unit of eighteen shares. The fact he got an order to sell at private sale did not extend the time when the personal assets liable for the payment of debts had to be sold. He knew that such effort as he exerted did not result in private sale, but he made no attempt to have that order modified and the stock sold at public sale, a thing which would have been in strict conformance with the statutes, the performance of his duties, and an absolute protection to him. Moreover, he allowed the matter to drift from the date of his qualification in June, 1928, until March, 1931, when, without having sold the unexempt bank stock, he procured an order for the sale of real estate, sold it, the most of the proceeds being applied to the debt of the estate to the bank of which he was cashier, as has been heretofore shown in more detail. But that is not all; he then did nothing about the bank stock until March, 1932, when he procured its re-appraisement at $100 per share. He again made futile attempts to sell the stock in a block and at private sale. Accomplishing nothing, he waited until March 1, 1935, when he procured an order permitting him as administrator to assign the stock to the bank of which he was cashier, in settlement of the balance of $1,000 due on the estate's debt to the bank. In the meantime interest on that debt had been paid out of the assets of the estate. The result was that an asset of the estate, worth at the time of the death the sum of $4,050 was so handled that it was only sufficient to satisfy a liability of $1,000, the balance due on the bank's claim. And it is not to be overlooked that the administrator did not complete the administration within one year, nor did he obtain any order granting him any extension of time as contemplated by R. S. 22-907 as amended by Laws of 1925, ch. 161, § 9, now appearing as G. S. 1935, 22-907.

We are of opinion the trial court rightly found that Emery as administrator was guilty of negligence and carelessness in handling

the estate and that the finding that he allowed his duties and fidelity to the bank of which he was cashier to unfairly influence his actions as administrator has ample support in the testimony, and that the conclusion must be there was unfaithful administration by reason of which the administrator is liable on his bond for damages and as provided by R. S. 22-1001.

Appellants present some contention that because of the statutory lien on the bank stock (G. S. 1935, 9-153), coupled with their claim there was no showing the bank stock could ever have been sold for more than the amount of the debt to the bank, a situation is presented where the administrator should not be held liable. The claim as to the facts is not borne out by the record. The legal question was determined in the first appeal. (See *In re Park,* 147 Kan. 142, syl. ¶¶ 2, 3, 75 P. 2d 842.) No more need be said than that the administrator had the same duty to handle and dispose of the bank stock as he would have had if the stock had been in a corporation where there was no provision for a statutory lien.

Appellants also contend the administrator should not be held liable for depreciation in the value of the bank stock. Their argument is founded on a premise the trial court's findings of carelessness, negligence and infidelity are not supported by the evidence. The premise is not true. The statutory provision applicable was R. S. 22-910, that administrators shall not "sustain any loss by the decrease or destruction, without their fault, of any part of the estate." The converse would seem to be that if the decrease were occasioned with or by the fault of the administrator he is liable.

Finally, it is argued there was no deviation from statutory duties imposed. This is predicated in part on the fact that the probate court failed to enter upon the records an order permitting sale at private sale. Certainly the probate court should make appropriate record of its orders on its journal. Here we have treated the order to sell at private sale as though the record were complete. The remainder of the argument is based on appellant's version of what the evidence showed, not on what the trial court concluded.

The conclusions above reached dispense with the necessity of discussing many of the authorities cited in the briefs.

Our review of the record convinces us that the trial court's conclusion, as reflected in its judgment, was correct, and the judgment is affirmed.